**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEW ORLEANS WORKERS' CENTER FOR RACIAL JUSTICE, 217 North Prieur Street, New Orleans, LA 70112, | |
| *Plaintiff*, | |
| v. | Case No. |
| UNITED STATES DEPARTMENT OF LABOR, 200 Constitution Avenue, NW, Washington, DC 20210, | |
| EUGENE SCALIA, in his official capacity as Secretary of Labor, 200 Constitution Avenue, NW Washington, DC 20210, and | |
| CHERYL M. STANTON, *in her official capacity as Administrator of the Wage and Hour Division of the United States Department of Labor*, 200 Constitution Avenue, NW, Washington, DC 20210, | |
| *Defendants*. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff New Orleans Workers' Center for Racial Justice ("NOWCRJ" or "Plaintiff") brings this action for declaratory and injunctive relief against Defendants United States Department of Labor ("DOL"), Eugene Scalia, in his official capacity as the Secretary of Labor, and Cheryl M. Stanton, in her official capacity as Administrator for the DOL's Wage and Hour Division ("WHD"), for violating the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*. Plaintiff alleges on information and belief:

## INTRODUCTION

1.      Forced labor and human trafficking are prevalent in the United States. While total numbers are hard to quantify, tens of thousands of victims in the United States have contacted the National Human Trafficking Hotline seeking help.[1] Globally, human trafficking, which includes labor trafficking, is a $150 billion industry.[2]

2.      As the DOL itself recognizes, the agency "has an important role to play in combating trafficking in persons through our civil enforcement of federal labor laws."[3] Yet a change in DOL policy eliminated essential protections for vulnerable immigrants subject to workplace abuses and human trafficking. This change makes it easier for employers to get away with exploiting their immigrant workers.

3.      Immigrants subject to forced labor and human trafficking are often reluctant to report these and similar crimes for fear of retaliation by their employers and of being reported to federal immigration authorities and removed from the United States.

4.      Recognizing such barriers to stopping such workplace crimes, Congress created the T and U visa programs. These visa programs encourage immigrants to report crimes to law enforcement and afford protection for those willing to cooperate. Victims who cooperate in the investigation or prosecution of certain crimes may be eligible for the U visa, while victims of "severe" trafficking, a term Congress defined to include forms of labor trafficking, may be eligible for a T visa.

---

[1] *Hotline Statistics*, National Human Trafficking Hotline, https://humantraffickinghotline.org/states.
[2] Tammy J. Toney-Butler & Olivia Mittel, *Human Trafficking,* StatPearls [Internet] (Jan. 2020), *https*://www.ncbi.nlm.nih.gov/books/NBK430910/.
[3] *Trafficking in Persons*, U.S. Dep't of Labor, https://www.dol.gov/agencies/oasp/resources/trafficking.

5.      Applications for U visas require a supportive certification form from a law enforcement agency, and applications for T visas benefit from such an endorsement. DOL, and in particular its WHD, is uniquely positioned to provide such certifications because, during investigations of federal workplace violations, WHD may also detect workplace-based crimes against immigrants, such as involuntary servitude and trafficking.

6.      In 2011, DOL created a robust program to process requests from immigrants seeking U visa certifications related to specific workplace crimes. As DOL later explained, this program would "significantly help qualifying victims of [workplace] crimes receive immigration relief from [DHS] and access the range of victim services that they need to recover and rebuild their lives."[4] In 2015, DOL expanded this program to include T visa endorsements.

7.      The ability to obtain a certification for a U or T visa application through the DOL program has been vital to immigrant workers and the organizations that work on their behalf. Many temporary guestworkers and undocumented immigrants fear employer retaliation, especially given the employer's control over their temporary work visas and ability to refer workers to federal immigration authorities. Similarly, immigrant workers are often afraid to interact with traditional law enforcement agencies, who may also refer the reporting individuals to immigration authorities.

8.      In contrast, reporting workplace violations to WHD previously involved a transparent and relatively safe process, which increased the likelihood of reporting. The WHD reporting program helped immigrant workers obtain essential protections for their health and safety and enhanced DOL's knowledge of and ability to respond to workplace crimes.

---

[4] *Fact Sheet on U and T Visas,* U.S. Dep't of Labor, https://www.dol.gov/general/immigration/u-t-visa.

9.      However, DOL has now reversed course. On July 1, 2019, Administrator Stanton issued a new policy that unnecessarily burdens a victim's ability to access U and T visa certifications ("New Certification Policy"). Under the New Certification Policy, WHD will refer certification requests to criminal law enforcement agencies and generally require that those criminal law enforcement agencies agree with WHD's assessment of potential underlying crimes before issuing a certification. Conditioning certification on criminal law enforcement referral and approval has a chilling effect on fearful workers who are already reluctant to come forward and speak publicly about crimes occurring in their workplaces.

10.     The New Certification Policy is a final agency action because it constrains agency discretion and imposes binding requirements regarding decisions on certification requests.

11.     The New Certification Policy violates the APA because it was promulgated without notice and comment and is arbitrary and capricious. Among other arbitrary qualities, WHD does not provide a rational reason for the policy change. As WHD previously determined and as DHS recognizes, WHD is uniquely positioned to detect qualifying workplace crimes in the first instance, making immediate referral to another law enforcement agency unnecessary and counterproductive. Further, WHD failed to consider how the new Policy would impact worker safety and discourage reporting, and thus acted arbitrarily in that respect as well. Indeed, the New Certification Policy hampers the agency's ability to hold accountable traffickers and other employers that violate essential workplace protections. WHD also failed to consider the reliance interests engendered by its prior policy.

12.     Accordingly, the Court should declare that the New Certification Policy violates the APA, vacate it, and set it aside.

## PARTIES

13.     Plaintiff New Orleans Workers' Center for Racial Justice was founded as a workers' rights and racial justice response to Hurricane Katrina by a group of black and immigrant workers who came together from public housing developments, FEMA trailer parks, day labor corners, and labor camps across Louisiana. It is a member-based 501(c)(3) non-profit committed to racial, gender, and immigrant justice. NOWCRJ has been nationally recognized for direct worker organizing, strategic campaigns, policy advocacy, and coalition building to advance immigrant rights, racial justice, and economic equity. Its principal office is located at 217 North Prieur Street, New Orleans, LA 70112.

14.     NOWCRJ works extensively in advocating for and representing immigrant workers. Its projects include the New Orleans Congress of Day Laborers, an organization of immigrant workers and families, and the Seafood Workers Alliance, which includes guestworkers and immigrant workers.

15.     As part of its work supporting immigrants, NOWCRJ has frequently applied for and obtained U and T visas on behalf of its clients.

16.     Defendant DOL is a federal agency headquartered in the District of Columbia. Its principal office is located at 200 Constitution Avenue, NW, Washington, DC 20210.

17.     Defendant Eugene Scalia, in his official capacity as Secretary of Labor, is responsible for DOL's functions. He maintains an office at DOL headquarters, located at 200 Constitution Avenue, NW, Washington, DC 20210.

18.     Defendant Cheryl M. Stanton, in her official capacity as Administrator of the WHD, is responsible for promoting and achieving compliance with labor standards to protect and enhance

the welfare of the nation's workforce. Administrator Stanton maintains an office at DOL headquarters, located at 200 Constitution Avenue, NW, Washington, DC 20210.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law. The relief requested herein is authorized by the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and the Court's authority to enjoin federal officers from violating federal law.

20.     Defendants' actions give rise to an actual case or controversy within the meaning of Article III of the U.S. Constitution.

21.     NOWCRJ has organizational standing to initiate this litigation on its own behalf. As explained further below, the consequences of the WHD's New Certification Policy have harmed and continue to harm Plaintiff. As an organization that assists and counsels immigrant workers, including those who have survived criminal acts and human trafficking, NOWCRJ's work is impaired by the New Certification Policy. The New Certification Policy has a chilling effect on the reporting of unlawful working conditions to WHD by immigrant workers, including NOWCRJ's member and clients. The New Certification Process also slows WHD's approval process and makes approvals more difficult to obtain.

22.      The New Certification Policy has required NOWCRJ to expend resources over and above normal levels to address confusion and uncertainty among survivors of workplace exploitation, causing a diversion of resources away from their other core programmatic activities.

23.     These injuries would be redressed by a favorable decision by this Court vacating the New Certification Policy.

24.     Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §

1391(e), because Defendants are headquartered in Washington, DC, and a substantial part of the

events or omissions giving rise to Plaintiff's claims occurred here.

## THE ADMINISTRATIVE PROCEDURE ACT

25.     The APA allows a person "suffering legal wrong because of agency action, or adversely

affected or aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. § 702. As

relevant here, under the APA, a reviewing court may "hold unlawful and set aside agency action,

findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law," *id.* § 706(2)(A) or "without observance of procedure required by law,"

*id.* § 706(2)(D).

26.     Defendants' actions constitute final agency actions and no further exhaustion of remedies

is required.

## FACTUAL ALLEGATIONS

### U and T Visas and Certification

27.     In 2000, Congress enacted the Victims of Trafficking and Violence Prevention Act

("VTVPA") in order "[t]o combat trafficking in persons, especially into the sex trade, slavery,

and involuntary servitude, [and] to reauthorize certain Federal programs to prevent violence

against women."[5]

28.     Immigrants without lawful status are particularly vulnerable to human trafficking,

domestic violence, sexual assault, stalking, and other crimes. This is due to a variety of factors,

including language barriers, separation from family and friends, lack of understanding of U.S.

---

[5] Pub. L. No.106-386, 114 Stat. 1464 (2000). The VTVPA included both amendments to the
Violence Against Women Act and a new statute, the Trafficking Victims Protection Act of 2000
("TVPA").

laws, fear of deportation, and cultural differences. Similarly, guestworkers with employer-sponsored visas such as H-2A (Temporary Agricultural Worker) and H-2B (Temporary Non-agricultural Worker) visas are vulnerable to mistreatment by their employer because they rely on their continued employment to maintain lawful immigration status.

29.     To address these issues, the VTVPA created two new forms of humanitarian immigration relief for victims of certain crimes: the "T visa," a nonimmigrant visa available to survivors of human trafficking; and the "U visa," a nonimmigrant visa available to survivors of certain serious crimes in the United States. Both U and T visas permit recipients and their immediate family members to live and work in the United States for four years. *See* 8 C.F.R. §§ 214.11(c)(1), 214.14(g).

30.     USCIS determines whether to grant or deny petitions for U and T visas.

31.     Both U and T visas incorporate a requirement (waivable in limited circumstances) that the visa applicant have been helpful in the investigation or prosecution of the underlying criminal activity. Accordingly, both visa programs strengthen the ability of law enforcement agencies to investigate and prosecute serious crimes and human trafficking, while offering immigration protections to victims of such crimes. This protection is essential to encourage victims to report criminal activity without fear of reprisal.

32.      Victims of qualifying criminal activities ("QCAs") who have suffered substantial physical or mental abuse may apply for a U visa if they are willing to assist law enforcement or other officials in the investigation or prosecution of those crimes. 8 U.S.C. § 1101(a)(15)(U). QCAs include, among other crimes, trafficking, involuntary servitude, and forced labor, as well as non-workplace-based crimes. *Id.* § (iii).

33.     A U visa application requires certification regarding the QCA from a law enforcement

agency – on Form I-918, Supplement B. The certification also confirms that the applicant has

been helpful or is likely to be helpful in investigation or prosecution of the QCA. 8 C.F.R. §

214.14(c)(2).

34.     U visas are capped at 10,000 per year. *Id.* § (d)(1). Because the need for such protections

is so great, an extensive backlog of applications currently exists, making the total processing

time for any given application several years long.

35.     Although an applicant will likely have to wait years for a final decision on a U visa

application, once USCIS determines that person meets the basic eligibility requirements, he or

she is placed on USCIS's waiting list and USCIS "will grant deferred action or parole" to the

applicant and qualifying family members, and may also authorize employment. *Id.* §

214.14(d)(2).

36.     As to T visas, individuals who have been the victims of a "severe" form of human

trafficking, are present in the United States as a result of the trafficking, comply with any

reasonable request for assistance in any Federal, State, or local investigation or prosecution of

acts of trafficking, and demonstrate that they would suffer extreme hardship involving unusual or

severe harm upon removal may qualify for a T visa. 8 U.S.C. § 1101(a)(15)(T).

37.     "Severe" forms of human trafficking include (but are not limited to) defined types of

labor trafficking. *Id*.

38.     Although law enforcement support is not required for a T visa application, a law

enforcement endorsement (sometimes also referred to as a certification) may strengthen an

application. 8 C.F.R. § 214.11(d)(3). Such an endorsement may be used, *inter alia*, to establish

victimization or compliance with reasonable law enforcement assistance requests. *Id.* §

214.11(d)(3)(i).

39.     T visas are subject to an annual cap of 5,000 visas, but that cap is not typically reached.

*Id.* § 214.11(j).

40.     U and T visa holders may apply for lawful permanent residence after three years. 8

U.S.C. § 1255(l), (m).

### WHD's Former Certification Policy

41.     In the course of its wage and hour investigations, DOL may detect workplace crimes that

could support the worker-victim's eligibility for a U and/or T visa. As DOL previously

explained:

> WHD enforces several critical federal workplace laws including the federal
> minimum wage and overtime laws. Because many wage and hour investigations
> take place in industries that employ vulnerable workers, WHD is often the first
> federal agency to make contact with these workers and detect exploitation in the
> workplace. Such activities may then be referred to the appropriate authorities.[6]

42.     DHS recognizes DOL's role in detecting underlying criminal activity in its U and T visa

regulations by identifying DOL as a law enforcement agency that has the authority to complete

and certify Supplement B forms for U visas, 8 C.F.R. § 214.14(a)(2), and provide endorsements

for T visas. *Id*. § 214.11(a).

43.     DHS's U visa regulation states that a certifying agency:

> means a Federal, State, or local law enforcement agency, prosecutor, judge, or
> other authority, that has responsibility for the investigation or prosecution of a
> qualifying crime or criminal activity. This definition includes agencies that have
> criminal investigative jurisdiction in their respective areas of expertise, including,
> but not limited to, child protective services, the Equal Employment Opportunity
> Commission, and the Department of Labor.

---

[6] *Fact Sheet: The Department of Labor Expands Its Support of Victims of Human Trafficking and
Other Crimes,* U.S. Dep't of Labor,
https://www.dol.gov/general/immigration/20150402u&tfactsheet.

*Id.* § 214.14(a)(2). DHS regulations also explain that detection of the underlying crime is included in the meaning of "investigation or prosecution" under the VTVPA. *Id.* § (a)(5)).

44.  Similarly, DHS identifies DOL as a law enforcement agency that may endorse a T visa application because of its "responsibility and authority for the detection, investigation, and/or prosecution of severe forms of trafficking in persons." *Id.* § 214.11(a).

45.  The Secretary has delegated DOL's certification authority to WHD, the component of DOL responsible for enforcing essential federal labor laws, including laws relating to the minimum wage, overtime, child labor, and the employment of temporary or seasonal migrant workers.

46.  As relevant here, WHD probes workplaces for evidence of minimum wage and overtime violations, with an emphasis on low-wage industries that are likely to employ vulnerable workers. Accordingly, WHD is often the first to detect evidence of QCAs while investigating violations of workplace laws. WHD investigators also have expertise regarding workplace crimes and mistreatment of workers.

47.  WHD's delegated authority includes the authority to issue bulletins providing guidance to staff responsible for completing certification requests.

48.  In April 2011, WHD issued Field Assistance Bulletin No. 2011-1 ("FAB 2011-1") detailing how and whether to certify the Supplement B form for U visa applicants.[7] That document explained that as a law enforcement agency responsible for the "*detection* or investigation of a qualifying crime or criminal activity, [*s*]*ee* 8 C.F.R. § 214.14(a)(5),"

> . . . . WHD will consider . . . certify[ing] Supplement B forms in cases in which it has detected a QCA and each of the following conditions are met: (1) the detected QCA is involuntary servitude, peonage, trafficking, obstruction of justice or

---

[7] Memorandum from Nancy J. Leppink, WHD Acting Adm'r to Regional Adm'rs & Dist. Dirs. (Apr. 28, 2011), https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/fab2011_1.pdf.

witness tampering; (2) the alleged QCA arises in the context of a work environment or an employment relationship; and (3) there is a related, credible allegation of a violation of a law that WHD enforces.

FAB 2011-1 at 2.

49.   WHD further explained that the QCAs it identified:

[A]re most likely to be found in connection with its workplace investigations and that it can effectively train its staff in the detection of these QCAs. WHD will document basic information and evidence concerning these QCAs when they are detected during a WHD investigation, but it does not have jurisdiction to investigate or prosecute these crimes. Thus DOL's authority to complete and certify Supplement B forms will be based on its role as a law enforcement agency that has 'detected' the crimes.

FAB 2011-1 at 3-4.

50.   FAB 2011-1 also explained how WHD would exercise its certification authority, including: creating regional U visa coordinator roles; designating Solicitor of Labor regional attorneys as responsible for preparing the Supplement B form and supporting documentation and providing advice as to the interaction between a certification request and WHD workplace investigations and criteria for determining whether to certify; delegating final authority to certify in most instances to the Regional Administrator, and establishing procedures for timeliness, transparency, and confidentiality.

51.   FAB 2011-1 made factual conclusions regarding petitioner safety and the importance of timely review, including that the certification of a U visa petition may help protect crime victims from future harm and that the timeliness of the certification review promotes the safety of the petitioner:

It is very important that all requests for U visa certification be processed expeditiously and that WHD notify the petitioner and/or his or her representative of its decision in writing as soon as possible. *The timely review of the petitioner's allegations and, where appropriate, the certification of a U visa petition could help to protect the individual victims of QCAs who may be at risk of future harm*, and whose cooperation with law enforcement officials will be helpful to investigating or prosecuting the alleged perpetrator(s) of the QCAs. In those cases

where WHD determines it will be unable to certify a Supplement B form, the petitioner should be provided with information as to which other law enforcement agencies may be able to certify the petition.

Fab 2011-1 at 8 (emphasis added).

52.     FAB 2011-1 estimated that it would take approximately three months for WHD to review and process a U visa certification request.

53.     In April 2015, WHD issued an Addendum to FAB 2011-1 to permit consideration of requests to complete U visa certifications based on three additional QCAs (fraud in foreign labor contracting, extortion, and forced labor).[8]

54.     The Addendum also explained that WHD would consider an endorsement (which it referred to as a certification) for T visa applicants:

in cases where the following conditions are met: (1) WHD has detected a severe form of trafficking in persons; (2) the trafficking activity arises in the context of a work environment or an employment relationship; and (3) there is a credible allegation of a violation of a law that WHD enforces related to the work environment or employment relationship.

FAB 2011-1 Addendum at 2.

55.     In processing T visa endorsement requests, WHD would employ the same general processes as for U visa applicants. *Id*.

56.     Under the procedures set out in FAB 2011-1 and the Addendum ("Prior Certification Policy"), WHD completed its certification or endorsement review "within weeks or a few months."[9]

---

[8] Memorandum from Dr. David Weil, WHD Adm'r to Regional Adm'rs & Dist. Dirs. (Apr. 2, 2015),https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/fab2011_1-addendum.pdf.
[9] Daniel Arkin, *After Epstein Fallout, Acosta's Critics Warn of 'Troubling' Lack of Resources for Trafficking Victims*, NBC News (July 9, 2019), https://www.nbcnews.com/news/us-news/after-epstein-fallout-acosta-s-critics-warn-troubling-lack-resources-n1027966.

57.     The Prior Certification Policy was a lifeline for vulnerable immigrants, especially those with employer-sponsored visas and those without lawful status. Workers whose immigration status depends on their employer's good will are often justifiably afraid of retaliation from their employer for reporting workplace crimes. Undocumented workers are often hesitant to report violations because of concerns about deportation. WHD's ability to certify qualifying visa applications encouraged reporting, thereby protecting both those particular immigrants and workers generally.

### WHD's New Certification Policy

58.     Ms. Stanton became the WHD Administrator on April 29, 2019. A few days later, she revoked authorities previously delegated to career officials, including the power to certify visas.[10] Administrator Stanton also imposed a moratorium on certifications for all new U and T visas.

59.     On July 1, 2019, Administrator Stanton issued, without notice and comment, Addendum 2 to FAB 2011-1 – the New Certification Policy.[11]

60.     As revealed by Freedom of Information Act records, WHD is applying the New Certification Policy to all pending U and T visa certification requests, including those submitted prior to issuance of the New Certification Policy on July 1, 2019.

61.     The New Certification Policy instructs Regional Administrators and District Directors on the process WHD "will follow to determine when and whether" to complete and certify U and T

---

[10] Ben Penn, *Human Trafficking Victims Blocked from Visas by Trump Wage Boss*, Bloomberg Law (June 24, 2019), https://news.bloomberglaw.com/daily-labor-report/human-trafficking-victims-blocked-from-visas-by-trump-wage-boss.

[11] Memorandum from Cheryl M. Stanton, WHD Adm'r to Regional Adm'rs & Dist. Dirs. (July 1, 2019), https://www.dol.gov/agencies/whd/field-assistance-bulletins/2011-1-addendum-2.

visa applications. The New Certification Policy imposes binding requirements on how WHD

staff process such certification requests, eliminating prior areas of staff discretion.

62.     The New Certification Policy changes WHD's process in the following ways:

First, it requires that WHD notify a criminal law enforcement agency of the underlying QCA or

trafficking violation *before* WHD makes a decision on whether to certify or endorse U and T visa

applications: "If a criminal law enforcement agency is not already engaged in the investigation or

prosecution of the QCA or trafficking activity, WHD will refer the detected QCA or trafficking

crimes to the appropriate enforcement agency in accordance with its referral protocols." FAB

2011-1 Addendum 2 at 2.

63.     Previously, WHD required referral of the underlying crime, but provided discretion to

determine when to do so, and required consideration of the petitioners' safety:

> Whether such a referral is made before or after a decision to complete and certify
> a Supplement B form will depend on the circumstances of a case. In all cases, the
> safety of the petitioner and his or her family should be a primary consideration, as
> well as the safety of other individuals who have been harmed or may be at risk of
> harm from the detected criminal activity. The regional U visa coordinator will
> provide guidance as necessary to the local District Office (DO) as to how to
> manage the referral and will, as appropriate, work with social service
> organizations or representatives for the petitioner.

FAB 2011-1 at 4.

64.     Second, the New Certification Policy requires WHD to wait to determine the status of the

criminal investigation before WHD may decide whether to certify a U visa application. FAB

2011-1 Addendum 2 at 2 ("Where WHD has referred the detected QCA to a criminal law

enforcement agency, WHD will determine (when possible) the status of the investigation before

issuing a certification for a U visa.").

65.     Previously, WHD would consider whether another agency was already engaged in the

investigation or prosecution or was in a better position to decide whether to issue such a

certification, FAB 2011-1 at 5, but did not make referral or determination of another agency's view a pre-condition for certification. Thus, workers could move forward with submitting their visa petitions without having to await additional determinations from these criminal law enforcement agencies.

66.     Third, the New Certification Policy imposes a new requirement that WHD consider the criminal law enforcement agency's view of the referred crime in the decision whether to certify. At times, the other agency's view now prevents WHD from exercising its certification authority:

> If the criminal law enforcement agency is already engaged in an investigation or prosecution, but does not complete the Supplement B form, WHD will request concurrence of WHD's identification of the QCA or trafficking crime before proceeding to file a certification. *If the criminal law enforcement agency does not concur, a certification will be declined*. If the criminal law enforcement agency does not respond or fails to take a position, a certification is not precluded and WHD will consider whether to complete the Supplement B form based on the facts presented. WHD will note in the file the criminal law enforcement agency's response. …

> If a criminal law enforcement agency declines to investigate because it determines that no QCA has occurred, WHD must decline to issue a certification because a QCA is a legal requirement for issuing the certification

FAB 2011-1 Addendum 2 at 2 (emphasis added). This change reduces WHD's ability to provide certifications or endorsements as to underlying crimes that it detects.

### The New Certification Policy's Flaws

67.     The New Certification Policy misunderstands WHD's authority to certify U and T visa applications based on its detection of an underlying qualifying crime.

68.     The New Certification Policy also deviates from many of the factual findings made by the Prior Certification Policy without acknowledgement or explanation. Specifically, WHD previously determined that the QCAs for which it determined it would provide certifications, "are most likely to be found in connection with its workplace investigations and that it can effectively train its staff in the detection of these QCAs." FAB 2011-1 at 3. Without explanation,

the New Certification Policy abandons this conclusion in favor of deferring to the assessment of an outside criminal law enforcement agency.

69.     In addition, WHD previously concluded that in deciding *when* to refer the underlying criminal activity to criminal law enforcement:

> the safety of the petitioner and his or her family should be a primary consideration, as well as the safety of other individuals who have been harmed or may be at risk of harm from the detected criminal activity. The regional U Visa coordinator will provide guidance as necessary to the local District Office (DO) as to how to manage the referral and will, as appropriate, work with social service organizations or representatives for the petitioner.

FAB 2011-1 at 4. This conclusion reflects the reality that immigrant workers face when considering whether to report workplace crimes—some criminal law enforcement agencies alert employers to such reports, subjecting the immigrants to immediate and potentially dangerous retaliation. The New Certification Policy's requirement that criminal referrals occur at the outset disregards the safety benefits resulting from the discretion regarding referral timing afforded by the Prior Certification Policy.

70.     The New Certification Policy also slows down WHD's processing of certification requests, leaving immigrants without protection for a longer period.

71.      These added hurdles harm vulnerable immigrant workers and expose survivors of criminal conduct to removal.[12]

### Injuries to NOWCRJ Caused by the New Certification Policy

72.     As discussed above, NOWCRJ's mission is to organize workers to advance racial justice and immigrant rights. Under the Prior Certification Policy, NOWCRJ relied on WHD's certification and endorsement process to further its mission.

---

[12] Ben Penn, *Trump Wage Chief Adds Visa Hurdles for Trafficking Victims*, Bloomberg Law (July 1, 2019), https://news.bloomberglaw.com/daily-labor-report/trump-wage-chief-adds-visa-hurdles-for-trafficking-victims.

73.    Under the Prior Certification Policy, NOWCRJ was able to rely on WHD's U and T visa certification program as an effective avenue of redress for immigrants experiencing abusive working conditions.

74.    The Prior Certification Policy provided a transparent and relatively low-risk option for immigrant workers to report workplace crimes. It is NOWCRJ's experience that employees with temporary guestworker visas or no visas at all face significant barriers to reporting abuses, for fear of losing their jobs, being blacklisted from other employment, and/or being deported. Under the Prior Certification Policy, NOWCRJ observed that immigrant workers were often much more comfortable engaging with WHD in the first instance because it is not a traditional criminal law enforcement agency. WHD's transparent U and T visa certification process provided sufficient assurances to those workers regarding their immigration status and safety to encourage them to report and cooperate. NOWCRJ was able to assist over 50 immigrant workers obtain their certification or endorsement from WHD under the Prior Certification Policy.

75.    NOWCRJ's work with the Seafood Workers Alliance ("SWA"), one of NOWCRJ's projects, is an example of how essential the Prior Certification Policy was for protecting immigrant workers from exploitation. NOWCRJ and its members organize the SWA.

76.    SWA's mission is to improve working conditions in Louisiana's seafood industry and communities by addressing, among other things, forced labor, community and workplace health and safety issues, and wages. SWA has hundreds of members in seafood plants across Louisiana. SWA members are seafood farmers, harvesters, and processing workers, including guestworkers, immigrant workers, and local workers.

77.     Seafood processing work is hazardous. Workers risk debilitating injuries ranging from lost limbs on the industry's high-speed assembly lines to carpal tunnel syndrome from repetitive hand movements.

78.     Many immigrants work in Louisiana's seafood processing industry, including undocumented immigrants and workers who are sponsored on employer-based temporary visas. Seafood processing work is often located in rural and isolated parts of Louisiana. NOWCRJ and SWA members have observed that these workers are especially vulnerable to retaliation by their employers. Termination results in the loss of any employer-sponsored visa, which forces the worker to return to his or her home country (if they can afford to do so) or stay in the United States without lawful status. Recruiters and employers may also retaliate against complaining workers by effectively blacklisting them for future seasons and threatening that workers will never be able to return to work in the industry or the United States again.

79.      Compounding this problem, NOWCRJ and SWA members have observed that owners and managers of large seafood processing companies often have a personal relationship with local law enforcement and immigration enforcement. Immigrant employees live with the fear of their employers retaliating against them by calling the police or immigration authorities to have them removed from the country.

80.     Through SWA and its other projects, NOWCRJ conducts campaigns throughout the region to organize workers. It was through one of these campaigns that NOWCRJ began working with Martha Uvalle, a guestworker from Mexico, and assisted her in organizing against her abusive employer. Ms. Uvalle's well-documented ordeal[13] exemplifies the perils of being an

---

[13] Adam Serwer, *24-Hour Shifts and Deportation Threats: The World of US Guest Workers*, Mother Jones (Apr. 25, 2013), https://www.motherjones.com/politics/2013/04/guest-worker-immigration-visa-gang-eight/; *see also* Mike Elk, *Louisiana's Undocumented Seafood Workers*

immigrant worker, the protections afforded by the Prior Certification Policy, and the harm

caused by the New Certification Policy to immigrant workers and allied organizations.

81.     Ms. Uvalle, a temporary guestworker with an H2-B Visa, migrated from Mexico to

Louisiana every year to peel crawfish for CJ's Seafood beginning in the mid-2000s. In 2009, the

working conditions became unbearable after CJ's Seafood won a contract with Walmart.

Workers were forced to work 16- to 24-hour days, and 80-hour weeks, at illegally low rates,

sometimes locked in the plant, peeling crawfish until their hands were numb. CJ's Seafood

management threatened some workers with beatings and crammed employees into squalid

trailers which served as living quarters.

82.     In May 2012, the situation reached a breaking point when Ms. Uvalle and her coworkers

were warned by CJ's Seafood management that, if they continued to complaint about working

conditions, they would lose their jobs and be sent back to Mexico. They were even threatened

with violence against themselves and their families in Mexico. Working with NOWCRJ, Ms.

Uvalle and some of her coworkers decided to organize a strike in protest. CJ's Seafood rejected

their demands and immediately fired the workers who protested. Loss of their jobs also meant

the loss of their temporary guestworker status.

83.     Ms. Uvalle was not forced to leave the country following CJ Seafood's retaliation against

her because, with NOWCRJ's assistance, she had contacted WHD to report the workplace

violations. She was eligible for a U visa based on the qualifying criminal activity of witness

tampering—namely CJ Seafood's threats of violence against her and her family intended to deter

---

*United to Fight Workplace Abuses*, The Guardian (Oct. 12, 2018),
https://www.theguardian.com/us-news/2018/oct/12/louisiana-seafood-workers-union-
undocumented-abuse.

her from cooperating with an investigation of illegal labor conditions. Relying on the Prior Certification Policy, she received a certification of her U visa application.

84.     Ms. Uvalle's and her coworkers' actions also triggered a series of positive workplace changes. Walmart dropped CJ's Seafood as a supplier. DOL initiated an investigation and fined CJ's Seafood for safety violations and for violations of wage and hour rules. It was also ordered to pay $76,000 in back pay to its workers.

85.     Ms. Uvalle obtained her U visa, has remained in the United States, and as an SWA and NOWCRJ member, organizes other immigrant workers experiencing exploitation.

86.     The New Certification Policy now makes it much more difficult for NOWCRJ to use the WHD certification and endorsement process. NOWCRJ must now pursue costly, time consuming, and less effective alternatives. The requirement of immediate referral to criminal law enforcement has discouraged workers with whom NOWCRJ works from pursuing planned reports to WHD regarding workplace crimes and requests for U visa certifications.

87.     For example, one group of workers organized by SWA and NOWCRJ was ready to report abusive working conditions to WHD last spring and to request U visa certifications. They abandoned those plans following the announcement of the New Certification Policy due to their fear of WHD's required referral to criminal law enforcement and retaliation by their employer.

88.     After several months spent reconsidering whether to report to WHD, this group decided in September 2019 to make the report to WHD because there were few safe alternatives. They did not request U visa certifications at that time because they were afraid of employer retaliation following a law enforcement referral. They have not received any relief yet.

89.     As a result, those workers, with SWA's assistance, redirected their efforts to the National Labor Relations Board—the workers' complaint is now pending at the NLRB. Redirecting the

complaint to the NLRB required new fact gathering and legal research, requiring significant NOWCRJ staff time; and not all workers were eligible for relief from the NLRB.

90.     Another group of workers organized by SWA were preparing to file a complaint about workplace violations with WHD and request U visa certifications, but abandoned that plan after implementation of the New Certification Policy. The workers feared retaliation by their employer if the employer learned of a WHD report following a referral to local law enforcement. With SWA's assistance, that group pursued other options for reporting the violations, but have not yet found an effective alternative.

91.     As a result of the change in policy, NOWCRJ must now counsel workers differently on their options for responding to workplace violations because reporting to WHD may no longer be a safe option, depending on the law enforcement agency to which the underlying crime would be referred. Even if a worker were to decide to report to WHD with NOWCRJ's assistance, conditioning the certification decision on the concurrence of a criminal law enforcement agency slows down the process and makes obtaining a certification for qualifying applications less likely.

92.     The harms caused to NOWCRJ by the change in certification policy are compounded by the lack of alternative law enforcement options to obtain U and T visa certifications. NOWCRJ has observed that state and local criminal law enforcement agencies are not effective alternatives to the WHD certification program because those agencies are unfamiliar with the U and T visa certification process and lack the resources or interest to determine their certification authority, are unfamiliar with identifying qualifying workplace based crimes, or are simply hostile to immigrants. NOWCRJ has observed that it is significantly more difficult, if not impossible, to obtain certifications for qualified applicants from state and local law enforcement agencies.

93.     NOWCRJ has been forced to respond to the New Certification Policy by spending scarce staff time and resources informing immigrant workers about their remaining options for responding to workplace violations now that an effective avenue for redress has been lost. For example, this has required (and continues to require) NOWCRJ staff to take numerous additional trips to locations in rural Louisiana to meet with those workers, to spend time rebuilding trust with the workers following the change in policy, informing them of their currently available options for reporting workplace crimes, and planning what, if any, steps to take to respond to abusive working conditions given the effective loss of the U and T visa certification path.

94.     For both groups of workers described above who abandoned or delayed planned reports of abusive working conditions to WHD, NOWCRJ staff spent the intervening months counseling those workers on their remaining options for seeking workplace protections. This has diverted NOWCRJ staff from other core work, such as organizing additional workers, outreach and know-your-rights education across the industry, meetings with worker members, leadership development, and building worker-led accountability and worker power across the industry to monitor and improve labor standards.

95.     The increased time that NOWCRJ has had to spend working with the workers who had planned to report to WHD, but decided to explore other options following the New Certification Policy, was time that NOWCRJ was not able to spend organizing other workers. The New Certification Policy therefore limits the number of workers NOWCRJ may serve as part of its organizational mission.

96.     NOWCRJ's travel expenses for SWA organizing work have increased as a result of the need to meet more frequently with workers to counsel them on their options for reporting workplace violations (aside from seeking a U or T visa certification from WHD).

97. NOWCRJ also decided that it had to open a new office in rural Louisiana to facilitate meeting with workers more frequently, in part because of the increase in staff time required to counsel them, discussed above. NOWCRJ budgeted for this opening, which was planned to happen in the summer of 2020, although it has been delayed due to the coronavirus pandemic.

98. The New Certification Policy makes it less likely that NOWCRJ's members will seek a certification or endorsement from WHD. Such declines in visa applications and hesitance to participate in the reporting process through WHD directly threaten and frustrate NOWCRJ's mission and purpose.

99. Even if a worker were to decide to proceed with a visa certification or endorsement request, NOWCRJ's mission remains frustrated. The New Certification Policy makes beneficial outcomes less likely for workers, since the outcome is contingent on the additional step of a law enforcement agency concurring with the request. Failure to obtain a U or T visa through WHD would require NOWCRJ to then pursue other more burdensome routes to obtain protections for its clients, such as seeking another certifying entity or creating another strategy to obtain the necessary workplace protections. It also makes the workers vulnerable to retaliation, which in turn requires additional time and staff resources.

100. The New Certification Policy no longer requires WHD to resolve certification or endorsement requests in a timely fashion, and NOWCRJ is aware of a growing and unmanageable certification request backlog. WHD has failed to provide any information to NOWCRJ about pending certification requests NOWCRJ submitted. Delays at WHD not only harm immigrant workers, but also require that NOWCRJ spend additional staff time and resources explaining the process and alternatives to workers.

101.    NOWCRJ has also had to devote staff time to reviewing and understanding the New

Certification Policy in order to advise members and advocate on their behalf. This use of time

has decreased the already scarce amount of time that it has available to provide legal services to

other programmatic areas.

102.    Accordingly, NOWCRJ brings this action on its own behalf because the New

Certification Policy (i) requires resource-intensive efforts that divert resources from its daily

operations; (ii) limits the efficacy of available avenues of redress to NOWCRJ's members and

others it serves, (iii) increases the costs NOWCRJ bears in its work on behalf of immigrant

survivors of workplaces abuse and crimes; and (iv) otherwise directly conflicts with, impairs,

and frustrates NOWCRJ's organizational mission and programmatic priorities.

## CLAIMS FOR RELIEF

### Count One
### (Procedurally Inadequate Rulemaking, 5 U.S.C. §§ 553, 706)

103.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully

set forth herein.

104.    Under the APA, an agency must provide the public with notice of a proposed rule, 5

U.S.C. § 553(b), and give "interested persons an opportunity to participate in the rule making

through submission of written data, views, or arguments." *Id.* § 553(c).

105.    Agencies cannot evade the APA's requirements merely by declining to publish a rule for

comment.

106.    The New Certification Policy is a legislative rule that has the force and effect of law. It

imposes binding requirements on WHD's process for certifying and endorsing visas, such as

requiring a referral to a criminal law enforcement agency before issuing a decision on

certification and requiring a certification denial if the criminal law enforcement agency does not concur and/or determines that no QCA has occurred.

107.    The New Certification Policy was promulgated without notice and comment as required by the APA.

108.    The New Certification Policy violates the APA because it was promulgated "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), and therefore must be set aside and vacated.

**Count Two**
**(Arbitrary and Capricious Rulemaking, 5 U.S.C. § 706(2))**

109.    Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

110.    The APA empowers this Court to set aside agency action that is arbitrary, capricious, or contrary to law. 5 U.S.C. § 706(2)(A). An agency's failure to provide a reasoned explanation for its actions is arbitrary and capricious.

111.    If an agency changes its position, it must display awareness that it is changing position, and a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.

112.    Defendants misunderstand DOL's legal authority to provide U and T visa certifications, gave no reasoned explanation for the New Certification Policy's changes, and disregard the facts and circumstances articulated in FAB 2011-1 and the first Addendum. Moreover, the New Certification Policy entirely failed to consider important aspects of the problem, is not the result of reasoned decision-making, did not consider its disruption of reliance interests, and is otherwise arbitrary and capricious.

113.    The New Certification Policy thus must be set aside and vacated.

**Prayer for Relief**

WHEREFORE, Plaintiff prays that this Court:

1.    Declare that the DOL's New Certification Policy violates the APA;

2.    Issue an order vacating and setting aside the New Certification Policy (FAB 2011-1, Addendum 2);

3.    Order such other and further relief as the nature of the case may require or as may be determined proper by this Court.

Dated: July 7, 2020                              Respectfully submitted,

/s/ *Robin F. Thurston*

Robin F. Thurston (DC Bar No. 1531399)
Michael C. Martinez*
Sean A. Lev (DC Bar No. 449936)
Democracy Forward Foundation
1333 H St NW Suite 1100
Washington, DC 20005
(202) 448-9090
rthurtson@democracyforward.org
mmartinez@democracyforward.org
slev@democracyforward.org

*Pro hac vice forthcoming*

*Counsel for Plaintiff*